**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

STANLEY BELL,                          :

     Plaintiff,                    :

vs.                                    :          CA 16-0214-MU

NANCY A. BERRYHILL,                    :
Acting Commissioner of Social Security,
                                       :
     Defendant.


## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for a period of disability and disability insurance benefits. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 30 & 31 ("In accordance with provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.")). Upon consideration of the administrative record, Plaintiff's brief, the Commissioner's brief, and the arguments of counsel at the May 10, 2017 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

---

[1]     Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 30 & 31 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of (Continued)

## I. Procedural Background

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on January 3, 2013, alleging disability beginning on November 1, 2008. (*See* Tr. 123-29.) His claim was initially denied on February 21, 2013 (Tr. 76-79) and, following Plaintiff's written request for a hearing before an Administrative Law Judge ("ALJ") (*see* Tr. 87-88), a hearing was conducted before an ALJ on May 29, 2014 (Tr. 35-66). During the hearing, Bell amended his disability onset date to November 9, 2012. (*See* Tr. 38.) On October 27, 2014, the ALJ issued a decision finding that the claimant was not disabled and, therefore, not entitled to disability insurance benefits. (Tr. 18-30.) More specifically, the ALJ went to the fifth step of the five-step sequential evaluation process and determined that Bell retains the residual functional capacity to perform those unskilled light jobs identified by the vocational expert ("VE") during the administrative hearing (*compare id.* at 29 *with* Tr. 60-62). On December 22, 2014, the Plaintiff appealed the ALJ's unfavorable decision to the Appeals Council (Tr. 12-14) and, the Appeals Council denied Bell's request for review on April 11, 2016 (Tr. 1-4).[2] Thus, the hearing decision became the final decision of the Commissioner of Social Security.

---

appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

[2]    In the course of its decision denying Ball's request for review, the Appeals Council noted the following: "We also looked at records and a medical source statement from Perry Timberlake, M.D. dated August 5, 2015 (4 pages). The Administrative Law Judge decided your case through December 31, 2013, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits." (Tr. 2.)

Plaintiff alleges disability due to depressive disorder, degenerative changes in the knee, and shoulder tendonitis. In light of the issues raised by Plaintiff in her brief (*see* Doc. 18, at 3 & 7), the Court simply replicates most of the residual functional capacity portion of the ALJ's decision (Tr. 30-36),[3] as follows:

> **5.       After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). He can lift and/or carry twenty pounds occasionally and ten pounds frequently; can stand and/or walk six hours in an eight-hour day; can sit for 6 hours out of an eight-hour workday; can push/pull up to twenty pounds; can frequently balance; occasionally stoop, kneel, and crouch; never crawl; can frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; can perform fine and gross manipulation without limitation; can only occasionally engage in overhead reaching with right upper extremity; no visual or hearing limitations; avoid concentrated exposure to unprotected heights and hazardous moving machinery; avoid excessive vibrations; can understand, remember and carry out simple routine repetitive tasks continually; can occasionally perform detailed tasks; can occasionally perform complex tasks; can maintain attention and concentration for two[] hours across an 8-hour workday with normal breaks; interact appropriately with co-workers and supervisors; contact with the public should be no more than occasional; [and] changes in the work setting should be minimal.**

> .        .        .

> There is no medical evidence of treatment after December 8, 2010, for almost two years, or until he was seen at Med Center Demopolis on November 9, 2012. The records show that his chief complaints at the time were right shoulder pain, both hips, and lower back pain for two years. He reported injuring himself two years before and that the pain was still constant. He reported being unable to sleep at night for the pain. He reported associated symptoms of frontal headache and joint pain with no swelling. He reported shoulder injury from a fall. He weighed 245 pounds and his blood pressure was 132/87. The findings on physical examination

---

[3]       The undersigned will deal separately with Bell's argument that the Appeals Council's erred in its decision with respect to the new evidence presented to it, particularly in light of his June 13, 2017 motion to correct the record (Doc. 33).

were normal and he was assessed with headache; arthralgia; and shoulder pain. He was prescribed Naprosyn and Norco with no refills. . . .

After filing for disability, a State Agency worksheet dated February 11, 2013, shows the doctor was contacted for clarification on the right shoulder x-ray. The record indicates the doctor stated the x-rays showed "AC separation old w/no acute fx".

Records from Hale County Hospital Clinic show on May 3, 2013, the claimant reported his right knee had been swollen for two weeks with no pain and on/off bilateral shoulder pain for one year. He reported taking no medications. Physical examination findings show his right knee was slightly larger than the left but was non-tender. He weighed 225 pounds and his blood pressure was 150/90. He was given prednisone.

The records from West Alabama Mental Health Center (West Alabama) show the claimant was seen on May 13, 2013, as a self-referral. The record shows the claimant reported he was laid off five years before and was sad because he was not working. The record shows he reported he had not been looking for work and was trying to get on disability. He reported that he had shoulder problems and was being treated by different doctors for that condition. The records note that the clinician rated the claimant's reliability as questionable. The claimant reported that he was married and had no source of income. He reported that his wife was on disability and that his son is an artist and helped him pay bills. He reported that he spent his time watching television. He reported auditory hallucinations and that his increased energy level made him dizzy when walking. The intake evaluation noted the claimant complained of anhedonia and that he has no "get up and go" anymore. He was assessed with major depressive disorder single episode moderate. The record shows over the counter Advil but no other prescriptions at that time. When he returned on June 13, 2013, the record indicates minimal progress and that he had deficient activity involvement and the goal was to increase interest in activities. The therapist encouraged the claimant to exercise and [make] healthy food choices. The next visit on July 11, 2013, shows the claimant reported he had been having trouble with his family and reported he and his wife fight all the time over finances. The therapist encouraged better communication skills and a referral to a physician for an assessment as soon as possible was to be made. The record noted he had made moderate progress. His motor activity was calm and his perceptual disturbances were within normal limits. The record shows he was being prescribed pain medication for his knee. His visit of August 5, 2013, indicates he was still on no psychotropic medications. The claimant reported not being involved in activities because "he does not have a ride to get anywhere." He reported good appetite and good sleep and his perceptual disturbances were within normal limits. When he returned on

September 9, 2013, the claimant had made moderate progress and reported he had been eating and sleeping well. He reported that he had been feeling better because he had been focusing on watching football, which makes him happy. He was to be referred to the physician for an initial psychiatric assessment. On October 9, 2013, the record shows he was making good progress. He reported going fishing, cutting grass and spending time with his family. The claimant was seen by Swati Poddar, M.D. on his visit of November 8, 2013. Dr. Poddar noted the claimant's thoughts were within normal limits. The claimant reported feeling low in his mood for the past year. He reported that he was married and lived with his wife at his son's house. He reported drinking alcohol two times a week or 24 cans a week. He was prescribed Mirtazapine to be taken every night at bedtime. He was to return to the clinic in three months and to follow-up with psychotherapist for individual psychotherapy. Dr. Poddar assigned a global assessment of functioning at Axis V of 90-100[4]. The therapist noted the claimant reported a little trouble with his sleep. He reported that he was more interested and taking part in more activities and had been spending time with his brother daily.

Records from Hale County Hospital Clinic show on November 26, 2013, the claimant report right knee pain, right shoulder pain, and headache. He reported that his right knee had been giving away for a year. His blood pressure was elevated at 138/102. Physical examination findings were normal except for a hard nodule on the top of his right shoulder. His right knee was normal. He weighed 228 pounds. He was to return in 4 months. High blood pressure was entered as a clinical diagnosis, along with right shoulder pain.

When he returned to West Alabama on December 23, 2013, he reported things were going well. He indicated he had no side effects from his medication and had been compliant. He reported that spending time with his family helped manage his depression and had some improvement with sleep. On January 24, 2014, the claimant reported auditory hallucinations, but reported making moderate progress on goals and plan to continue motivation to increase meaningful structured activity to occupy time and thoughts. He reported good appetite ad good sleep. The claimant saw Dr. Poddar on his next visit of February 3, 2014. He reported doing well and able to carry out his activities of daily living (ADLs). His perceptual disturbances were within normal limits and he reported good appetite and

---

[4]    "The Global Assessment of Functioning, or GAF scale, is a numeric scale (1 through 100) used as axis V of DSM-IV to rate the social, occupational and psychological functioning of an adult and how well or adaptively an adult is meeting various problems in living. A rating of 91-100 [is] indicative of a person with no symptoms. A rating of 90-81 is someone [who] has few or no symptoms, good functioning in several areas, and no more than 'everyday' problems or concerns." (Tr. 25, n.1.)

good sleep. He had some biological signs of depression. His dosage of Mirtazapine was increased and he was to return to see Dr. Poddar in 3 months. Progress notes from his visit to the therapist on February 20, 2014, show he was making moderate progress. He reported being involved in constructive activities and had been taking a walk every day. He was compliant with his medication and reported no side effects. When he returned on March 20, 2014, he was making good progress. He reported that he had been getting out more with friends and relatives. He reported being compliant with his medication but that it did not help. His perceptual disturbances were within normal limits and he reported good appetite and good sleep.

He returned to Hale County Hospital Clinic on March 31, 2014, for a follow-up of his blood pressure. He reported numbness in his left leg and burning in the sole of his left foot for months, along with chronic left knee pain. The record indicates that claimant probably has osteoarthritis in his shoulder and knee. His blood pressure was 132/90 and he weighed 236 pounds. Physical examination findings show he had no back pain. The clinical diagnoses were pain in his left knee, neuropathy, and headache.

When he returned to West Alabama on April 17, 2014, he reported having some trouble staying asleep. His perceptual disturbances were within normal limits and he reported good appetite.

Records show that the claimant's primary care physician at Hale County Hospital Clinic, Dr. Perry Timberlake, indicated on June 11, 2014, that he had ordered x-rays of the claimant's knees and right shoulder to be taken at the Good Samaritan Clinic before he could give an opinion as to the claimant's disability.

On June 23, 2014, the claimant underwent a medical examination by State agency orthopedic consultant R. Rex Harris, M.D. Physical examination findings show the claimant has full range of motion of the neck, shoulders, elbows, wrists, and fingers. His grip is 5 out of 5 bilaterally. Pinch is excellent. He was able to open and close doors and button and unbutton buttons, lace and unlace shoes, and pick up small objects. His reflexes are 1+ and equal in the upper extremities with normal sensation. His lumbar flexion is normal. There is full range of motion of the hips, knees, and ankles. Toe extensors are normal. His reflexes are 1+ and equal in the lower extremities with normal sensation. His gait is normal. Dr. Harris noted that the claimant can toe and heel walk and can squat and rise. He noted that the x-rays of the right knee, standing view, reveal well-preserved joint spaces with no evidence of arthritis, x-rays of the right shoulder show no evidence of arthritis and no evidence of AC joint arthritis. He opined that the claimant is capable of at least sedentary work in the workplace.

On June 25, 2014, the claimant underwent a mental examination by State agency consultant Donald W. Blanton, Ph.D. The claimant reported to Dr. Blanton that he began to have depression in his 30s and does not know why. The claimant described the depression as "I don't want to do anything and I'm angry all the time." He also reported that the treatment he had received from the mental health center had not been helpful to him. He also reported that he had been separated from his wife for about a year and a half. Dr. Blanton noted that the claimant was obsessing about his health problems and did not appear to put forth good effort on cognitive testing. He opined that the claimant's performance brings all of his complaints into question.

Records from The Radiology Clinic at Good Samaritan show the claimant underwent knee x-rays ordered by Dr. Timberlake on July 24, 2014. The report of left knee x-rays show mid tri-compartmental degenerative changes but no discrete joint effusion and no acute abnormality. The report of right knee x-rays show the same findings. On August 4, 2014, report of an MRI of the right shoulder indicates the claimant has mild supraspinatus and subcapularis tendinosis; mild subacromial/subdeltoid bursitis; and elevation of the distal clavicle in relation to the acromion suggestive of an old AC joint separation injury.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

There are no objective findings or physical examination findings to support the claimant's allegations that his right knee swells 3 to 4 times a week, and limits his ability to walk only 150 feet and stand 20 to 25 minutes. He stated Dr. Timberlake told him to elevate his right leg above his heart when he was swelling but the records do not indicate he was ever told that. In addition, the treatment records do not support his testimony regarding the frequency of knee swelling. X-rays of his knees only show mild degenerative changes.

The objective findings and physical examination findings also do not support that he has problems sitting due to shoulder pain, which cause him to have to lie down. X-rays of his shoulder indicate mild tendinitis and bursitis. All of the radiological and diagnostic studies indicate minimal abnormality.

Additional factors, which the undersigned must also consider when determining the claimant's credibility and residual functional capacity, are his daily activities and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. The claimant has alleged he is very restricted in his activities of daily living, in that he spends most of his day lying around watching television, yet, he is independent in his personal care and grooming and his psychiatrist reported he is doing well and able to carry out his ADLs. Mental health records indicate he reported going fishing, cutting grass and spending time with his family. His mental health records do not support severe mental symptoms.

The claimant's medical records do not indicate any complaints of medication side effects, as he testified. No treating or examining physician has reported that the claimant has disabling pain or limitations and physician examinations are essentially unremarkable. The claimant's treatment has been conservative and he has not received the type of medical treatment one would expect for a totally disabled individual. Based on the foregoing, the claimant's symptoms and subjective complaints are found not to be fully credible and are not consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR §[] 404.929.

The assessment of the claimant's residual functional capacity allows for many of his subjective complaints. The medical evidence shows the claimant reported headaches a few times but not the frequency as the claimant testified. In consideration of having occasional headaches, the residual functional capacity limits him to no excessive vibrations. The claimant testified of being unable to grip more than a second, but there is no medical evidence of an impairment that would cause any manipulative limitations. Giving the claimant full benefit of doubt and viewing the totality of the evidence, the undersigned finds that a restriction to light work would significantly reduce the impact of the claimant's shoulder and knee impairments. He would not be required to lift or carry much weight, while also allowing for significant environmental and postural restrictions. In consideration of the mild degenerative changes in his knees, he has been assessed with postural limitations. In consideration of the claimant's testimony that he cannot reach above his right shoulder, he is limited to only occasional reaching overhead with his right upper extremity. The undersigned finds that the evidence supports that the claimant's depressive disorder would not preclude the ability to perform the mental requirements of unskilled work. No treating physician or medical consultant has indicated that the claimant is disabled and there is no contraindication in the medical evidence of record for the ability to perform at least unskilled light work with the above listed limitations.

As for the opinion evidence, good weight is afforded Dr. Harris's physical examination findings, which are consistent with the treatment records from Hale County Hospital Clinic. However, no weight is afforded the opinions Dr. Harris expressed in his Medical Source Statement as they are inconsistent with his own physical examination findings that indicate no abnormalities.

No weight is afforded the report by Dr. Hinton as it shows the claimant did not put forth good effort on cognitive testing.

.    .    .

**6.    Through the date last insured, the claimant was unable to perform any past relevant work.**

.    .    .

**7.    The claimant was born on April 8, 1961 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured.**

**8.    The claimant has at least a high school education and is able to communicate in English.**

**9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.**

**10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.**

.    .    .

Through the date last insured, if the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.13. However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, through the date last insured, the Administrative Law Judge asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative unskilled light occupations such as

garment sorter, DOT Code 222.687-014, light and unskilled with an SVP 2, 700 jobs in Alabama and 130,000 jobs nationally; marker, DOT Code 209.587-034, light and unskilled with an SVP 2, 2,000 jobs in Alabama and one million jobs nationally; and silverware wrapper, DOT Code 318.687-010, light and unskilled with an SVP 1, 600 jobs in Alabama and 200,000 jobs nationally.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 1, 2008, the alleged onset date, through December 31, 2013, the date last insured.**

(Tr. 22, 23-28, 28 & 29 (internal citations omitted)).

## II. Standard of Review and Claims on Appeal

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation

to determine whether the claimant is disabled, which considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the RFC to perform h[is] past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Commissioner of Soc. Sec.*, 457 Fed. Appx. 868, 870 (11th Cir. Feb. 9, 2012)[5] (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f);

*Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The

---

[5]    "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

claimant bears the burden, at the fourth step, of proving that he is unable to perform his previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. *Id.* at 1005. Although "a claimant bears the burden of demonstrating an inability to return to his past relevant work, the [Commissioner of Social Security] has an obligation to develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted). If a plaintiff proves that he cannot do his past relevant work, as here, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable—given his age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Phillips, supra,* 357 F.3d at 1237; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that he can perform those light, unskilled jobs identified by the vocational expert at the administrative hearing, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as

unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[6] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'" *Id.* (quoting *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

On appeal to this Court, Bell asserts two reasons why the Commissioner's decision to deny him benefits is in error (*i.e.,* not supported by substantial evidence): (1) the ALJ erred in rejecting the opinions of the consultative examiners, Dr. Richard R. Harris and Dr. Donald W. Blanton; and (2) the Appeals Council erred in refusing to consider the opinion of the treating physician, Dr. Perry Timberlake, based solely on the date reflected on the assessment form.

**A.** **Opinions of Consultative Examiners Dr. Richard R. Harris and Dr. Donald W. Blanton**. The Plaintiff's first assignment of error is that the ALJ reversibly erred in rejecting the opinions of consultative examiners Dr. Richard Harris and Dr. Donald Blanton. (Doc. 18, at 3-6.) In making this argument, Bell also contends that the ALJ's residual functional capacity determination is not supported by substantial evidence in light of his improper rejection of the opinions of these two consultative

---

[6]    This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

examiners. (*See id.*) Accordingly, the undersigned considers Bell's consultative examiner argument under the larger "umbrella" of the ALJ's RFC determination.

The responsibility for making the residual functional capacity determination rests with the ALJ. *Compare* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.") *with, e.g., Packer v. Commissioner, Social Security Admin.*, 542 Fed. Appx. 890, 891-892 (11th Cir. Oct. 29, 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal citation omitted)). A plaintiff's RFC—which "includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, co-workers and work pressure[]"—"is a[n] [] assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Watkins v. Commissioner of Social Security,* 457 Fed. Appx. 868, 870 n.5 (11th Cir. Feb. 9, 2012) (citing 20 C.F.R. §§ 404.1545(a)-(c), 416.945(a)-(c)); *see also* 20 C.F.R. § 404.1545(a)(3) (in assessing RFC, the Commissioner is required to consider "descriptions and observations of [the claimant's] limitations from [] impairments,

including limitations that result from [] symptoms, such as pain, provided by [the claimant] . . . .").

To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has "'provide[d] a sufficient rationale to link'" substantial record evidence "'to the legal conclusions reached.'" *Ricks v. Astrue*, 2012 WL 1020428, *9 (M.D. Fla. Mar. 27, 2012) (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)); *compare id. with Packer v. Astrue*, 2013 WL 593497, *4 (S.D. Ala. Feb. 14, 2013) ("'[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.'"), *aff'd,* 542 Fed. Appx. 890 (11th Cir. Oct. 29, 2013); *see also Hanna v. Astrue*, 395 Fed. Appx. 634, 636 (11th Cir. Sept. 9, 2010) (per curiam) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review. . . . Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review [a plaintiff's] case." (internal citation omitted)).[7] However, in order to find the ALJ's RFC assessment supported by

---

[7]     It is the ALJ's (or, in some cases, the Appeals Council's) responsibility, not the responsibility of the Commissioner's counsel on appeal to this Court, to "state with clarity" the grounds for an RFC determination. Stated differently, "linkage" may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the Commissioner's decision.  *See, e.g., Durham v. Astrue*, 2010 WL 3825617, *3 (M.D. Ala. Sept. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision]' when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'" (quoting *Hanna*, 395 Fed. Appx. at 636 (internal quotation marks omitted))); *see also id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ **could have** relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion]. (Continued)

14

substantial evidence, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g., Packer, supra,* 2013 WL 593497, at *3 ("[N]umerous court have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."); *McMillian v. Astrue*, 2012 WL 1565624, *4 n.5 (S.D. Ala. May 1, 2012) (noting that decisions of this Court "in which a matter is remanded to the Commissioner because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that substantial and tangible evidence must—in all cases—include an RFC or PCE from a physician" (internal punctuation altered and citation omitted)); *but cf. Coleman v. Barnhart,* 264 F.Supp.2d 1007 (S.D. Ala. 2003).

In this case, the Court finds that the ALJ linked his RFC assessment—that is, a reduced range of light work—to specific evidence in the record bearing upon Bell's ability to perform the physical, mental, sensory and other requirements of work. (*Compare* Tr. 22 & 23-28 *with generally* Tr. 194-308.) In particular, even though the Plaintiff is correct that the ALJ rejected the majority of Dr. Harris' physical RFC opinions (*see* Tr. 287-92), as well as the mental RFC opinions/findings of Dr. Blanton (*see* Tr. 296-98), the ALJ set forth adequate reasons for rejecting these particular opinions (Tr.

_____

However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support. Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct." (emphasis in original)); *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

28).[8] The ALJ correctly observed that the opinions expressed by Dr. Harris in his Medical Source Statement (that is, his physical RFC assessment) were "inconsistent with his own physical examination findings that indicate no abnormalities[]" (Tr. 28). Dr. Harris' physical examination findings were entirely normal and devoid of any abnormalities (*see* Tr. 284 ("There is full range of motion of the neck, shoulders, elbows, wrists, and fingers. Grip is 5 out of 5 bilaterally. Pinch is excellent. The claimant can open and close doors and button and unbutton buttons, and lace and unlace shoes and pick up small objects. Reflexes are 1+ and equal in the upper extremities. Sensation is normal in the upper extremities. Lumbar flexion is normal. There is full range of motion of the hips, knees and ankles. Toe extensors are normal. Reflexes are 1+ and equal in the lower extremities. Sensation is normal in the lower extremities. Gait is normal. The claimant can toe and heel walk and can squat and arise. X-rays of the right knee, standing review, reveal well preserved joint spaces with no evidence of arthritis. X-rays of the right shoulder shows no evidence of arthritis. No evidence of AC joint arthritis.")); therefore, these objective findings of Dr. Harris supplied the ALJ with good cause to reject the consultative examiner's RFC opinions. *Cf., e.g., Gilabert v. Commissioner of Social Sec.*, 396 Fed.Appx. 652, 655 (11th Cir. Sept. 21, 2010) (per curiam) (finding

---

[8]        In general, "the opinions of examining physicians are given more weight than those of non-examining physicians, treating physicians are given more weight than those of physicians who examine but do not treat, and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." *McNamee v. Social Security Administration,* 164 Fed.Appx. 919, 923 (11th Cir. Jan. 31, 2006). In assessing the medical evidence, "[t]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor[,]" *Romeo v. Commissioner of Social Security,* 2017 WL 1430964, *1 (11th Cir. Apr. 24, 2017) (citing *Winschel v. Commissioner of Social Security,* 631 F.3d 1176, 1179 (11th Cir. 2011)), and the ALJ's stated reasons must be legitimate and supported by the record, *see Tavarez v. Commissioner of Social Security,* 638 Fed.Appx. 841, 847 (11th Cir. Jan. 7, 2016) (finding that the "ALJ did not express a legitimate reason supported by the record for giving [the consulting physician's] assessment little weight.").

good cause exists to not accord substantial or considerable weight to opinion of a treating physician where that opinion is inconsistent with the doctor's own medical records).

Turning to Dr. Blanton's consultative opinion, which indicated significant limitations in Bell's ability to interact appropriately with supervision, co-workers, and the public (*see* Tr. 297 (indicating marked limitations in plaintiff's ability to interact appropriately with the public and supervisors; a marked limitation in the ability to respond appropriately to usual work situations and to changes in a routine work setting; and a moderate limitation in the ability to interact appropriately with co-workers)), the ALJ accorded it no weight because "the claimant did not put forth good effort on cognitive testing[.]" (Tr. 28.) Although Plaintiff would have this Court question the reason offered by the ALJ for rejecting Dr. Blanton's opinion, on the basis that Dr. Blanton did not express any doubt about Bell's depression (*see* Doc. 18, at 6 ("[D]espite Mr. Bell's lack of effort on cognitive testing, there is no indication he did not cooperate with the remainder of the mental status examination. Dr. Blanton never expressed any doubt regarding Mr. Bell's depressive disorder, and in fact he made the definitive diagnosis of major depression recurrent type[.]")), this Court simply cannot find in favor of Plaintiff in this regard given Dr. Blanton's specific statement that the claimant's "performance here today brings all of his complain[t]s [into] question." (Tr. 295; *see also id.* ("Stanley Bell is a 53-year-old black male who may be having some depression problems but he did appear to not put forth good effort on cognitive testing today. He may be very limited intellectually but his performance here today brings all of his complain[t]s [into] question.")). In other words, Dr. Blanton's statements on his examination summary are

much broader than the Plaintiff would have this Court find and those statements undermine the viability of the mental limitations reflected on Blanton's medical source statement (*compare id. with* Tr. 297). Moreover, in entering a diagnosis (that is, major depression recurrent type), Dr. Blanton simply "intoned" Bell's previous diagnosis (Tr. 295 ("major depression recurrent type, previously diagnosed")), while also noting that malingering needed to be ruled out (*id.*). Therefore, the diagnosis, by itself, cannot serve to substantiate the severe limitations noted on the mental medical source statement both because Blanton equivocates in making the diagnosis (Tr. 295 ("DSM V a) major depression recurrent type, previously diagnosed b) rule out malingering")) and because Bell's treating source not once gave any indication that this impairment would cause the limitations noted by Blanton as related to the ability to interact appropriately with supervision, co-workers, and the public (*see* Tr. 222-40 & 252-77 (reflecting, in general, appropriate affect/mood and appearance/grooming, no orientation deficits or perceptual disturbances, calm motor activity, good appetite, thoughts within normal limits, and adequate insight and judgment)). Accordingly, this Court cannot agree with Bell that the ALJ erred in rejecting Dr. Blanton's mental RFC opinion. *Cf., e.g., Gilabert, supra,* 396 Fed.Appx. at 655 ("Good cause [for failing to accord the opinion of a treating physician substantial or considerable weight] is shown when the: '(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)).

In conclusion, the undersigned would simply note that the ALJ in this case specifically linked his RFC determination (*see* Tr. 22 ("**After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). He can lift and/or carry twenty pounds occasionally and ten pounds frequently; can stand and/or walk six hours in an eight-hour day; can sit for 6 hours out of an eight-hour workday; can push/pull up to twenty pounds; can frequently balance; occasionally stoop, kneel, and crouch; never crawl; can frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; can perform fine and gross manipulation without limitation; can only occasionally engage in overhead reaching with right upper extremity; no visual or hearing limitations; avoid concentrated exposure to unprotected heights and hazardous moving machinery; avoid excessive vibrations; can understand, remember and carry out simple routine repetitive tasks continually; can occasionally perform detailed tasks; can occasionally perform complex tasks; can maintain attention and concentration for two[] hours across an 8-hour workday with normal breaks; interact appropriately with co-workers and supervisors; contact with the public should be no more than occasional; [and] changes in the work setting should be minimal.**")) with specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work (*compare* Tr. 27 ("The assessment of the claimant's residual functional capacity allows for many of his subjective complaints. The medical evidence shows the claimant reported headaches a few times but not the frequency as the

claimant testified. In consideration of having occasional headaches, the residual functional capacity limits him to no excessive vibrations. The claimant testified of being unable to grip more than a second, but there is no medical evidence of an impairment that would cause any manipulative limitations. Giving the claimant full benefit of doubt and viewing the totality of the evidence, the undersigned finds that a restriction to light work would significantly reduce the impact of the claimant's shoulder and knee impairments. He would not be required to lift or carry much weight, while also allowing for significant environmental and postural restrictions. In consideration of the mild degenerative changes in his knees, he has been assessed with postural limitations. In consideration of the claimant's testimony that he cannot reach above his right shoulder, he is limited to only occasional reaching overhead with his right upper extremity. The undersigned finds that the evidence supports that the claimant's depressive disorder would not preclude the ability to perform the mental requirements of unskilled work. No treating physician or medical consultant has indicated that the claimant is disabled and there is no contraindication in the medical evidence of record for the ability to perform at least unskilled light work with the above listed limitations.") *with* Tr. 194-201, 217, 243-46, 284-86, 301-02 & 305-07 (reflecting grossly normal findings on physical examinations, with the exception of a hard nodule on the top of the right shoulder; x-rays of the knees showing no acute abnormality; and MRI of the right shoulder reflecting mild supraspinatus and subscapularis tendinosis, with no rotator cuff tear, and mild subscromial/subdeltoid bursitis) and Tr. 222-40 & 252-77 (reflecting, in general, appropriate affect/mood and appearance/grooming, no orientation deficits or perceptual disturbances, calm motor activity, good appetite, thoughts within normal limits, and

adequate insight and judgment)). Accordingly, the undersigned finds that the ALJ's RFC assessment is supported by substantial evidence and, as a result, this Court cannot find in Plaintiff's favor with respect to his first assignment of error.

        **B.    New Evidence Submitted to the Appeals Council.** Bell contends that the Appeals Council erred in refusing to consider the opinion of the treating physician, Dr. Perry Timberlake, based solely on the date of the assessment form. (Doc. 18, at 7-9.) Within the context of this "new evidence" argument, Plaintiff also parenthetically noted that he presented to the Appeals Council certain treatment records, dated May 30, 2014 through June 1, 2015, that do not appear in the record and which his attorney asserted, during oral arguments on May 10, 2017, were returned to him by the Appeals Council. All of this prompted Plaintiff to file, on June 13, 2017, a motion to correct the record by submitting the records purportedly returned to his attorney, as well as a June 1, 2017 additional letter opinion by the Appeals Council. (*See* Doc. 33 & Attachments.)[9] There is no question but that the information Plaintiff's counsel has now supplied this Court indicates that the treatment notes from the Hale County Hospital Clinic, which are primarily from Dr. Timberlake, from May 30, 2014 through June 1, 2015 were part and parcel of the information sent to the Appeals Council on November 27, 2015 (*see* Doc. 33, Attached ERE Form); however, because these medical records (*see* Doc. 33, Attached Medical Records, at 8-15) are not part of the administrative record filed in this

---

[9]    The Court would note that some of the attached medical records are part of the administrative transcript, either as "new evidence" addressed by the Appeals Council—that is, the records generated by Dr. Perry Timberlake on August 3, 2015 (*compare* Doc. 33, Attached Medical Records, at 2-7 *with* Tr. 8-11)—or as evidence addressed by the ALJ—that is, the MRI report dated August 4, 2014 (*compare* Doc. 33, Attached Medical Records, at 16 *with* Tr. 305). Therefore, these medical records obviously will not be referenced during discussion of Plaintiff's motion to correct record (Doc. 33), beyond what has been rendered necessary by the Commissioner's response (*see* Doc. 35).

Court (*see* Doc. 16, Social Security Transcript), the undersigned initially considers the Appeals Council's treatment of Dr. Timberlake's treatment notes and medical source and CAP statements dated August 3, 2015 (*see* Tr. 8-11). With respect to this evidence, the Appeals Council stated the following: "We also looked at records and a medical source statement from Perry Timberlake, M.D. dated August [3], 2015 (4 pages). The Administrative Law Judge decided your case through December 31, 2013, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits." (Tr. 2.)

The Eleventh Circuit has made clear that "[w]ith few exceptions, the claimant is allowed to present new evidence at each stage of th[e] administrative [review] process[,]" including before the Appeals Council. *Ingram v. Commissioner of Social Security Admin.,* 496 F.3d 1253, 1261 (11th Cir. 2007). And while the Appeals Council has the discretion not to review the ALJ's denial of benefits, *Flowers v. Commissioner of Social Security,* 441 Fed.Appx. 735, 745 (11th Cir. Sept. 30, 2011), it "must consider new, material, and chronologically relevant evidence" submitted by the claimant. *Ingram, supra,* 496 F.3d at 1261*; see also* 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.").

> The new evidence is material if it is "relevant and probative so that there is a reasonable possibility that it would change the administrative result." *Hyde v. Bowen,* 823 F.2d 456, 459 (11th Cir. 1987) (citations omitted). It is chronologically relevant if "it relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970(b). If these conditions are satisfied, the Appeals Council [] must then review the case to see whether

the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Id.*

*Ring v. Berryhill,* 2017 WL 992174, *4 (N.D. Ala. Mar. 15, 2017).

In *Flowers, supra,* the Eleventh Circuit made clear that "[w]hen a claimant properly presents new evidence, and the Appeals Council denies review, the Appeals Council must show in its written denial that it has adequately evaluated the new evidence." 441 Fed.Appx. at 745 (citation omitted). Indeed, "[i]f the Appeals Council merely 'perfunctorily adhere[s]' to the ALJ's decision, the Commissioner's findings are not supported by substantial evidence and we must remand 'for a determination of [the claimant's] disability eligibility reached on the total record.'" *Id.,* quoting *Epps v. Harris,* 624 F.2d 1267, 1273 (5th Cir. 1980). The panel in *Flowers* ultimately concluded that the Appeals Council did not adequately consider the new evidence submitted by the claimant because "apart from acknowledging that Flowers had submitted new evidence, the Appeals Council made no further mention of it or attempt to evaluate it." *Id.*

However, since the decision in *Flowers,* subsequent panels of the Eleventh Circuit have indicated that where the Appeals Council accepts a claimant's new evidence but denies "review because the additional evidence fail[s] to establish error in the ALJ's decision[,]" that administrative body adequately evaluates the new evidence. *Mitchell v. Commissioner, Social Security Admin.,* 771 F.3d 780, 784 (11th Cir. 2014); *see also Beavers v. Social Security Admin., Commissioner,* 601 Fed.Appx. 818, 822 (11th Cir. Feb. 9, 2015) ("Here, the Appeals Council denied Worthy's petition for review, stating, as it did in *Mitchell*, that it had considered Worthy's reasons for disagreeing with the ALJ's decision and her new evidence, but found that the new evidence did not provide a basis for changing the ALJ's decision. Under *Mitchell*, no further explanation

was required of the Appeals Council."). Indeed, the *Mitchell* panel noted that the Appeals Council "was not required to provide a detailed rationale for denying review." 771 F.3d at 784; *see also id.* at 784-85 ("We note that our conclusion that the Appeals Council is not required to explain its rationale for denying a request for review is consistent with the holdings of other circuits that have considered this issue.").

These subsequent panel cases leave the viability of *Flowers* somewhat questionable given that, as noted by the court in *Flowers*, the Appeals Council "stated that it had considered Flowers's reasons for her disagreement with the ALJ's decision and her additional evidence[]" but "concluded 'that this information does not provide a basis for changing the Administrative Law Judge's decision.'" 441 Fed.Appx. at 740. This, of course, is the exact Appeals Council rationale upheld by later Eleventh Circuit panels in *Mitchell* and *Beavers* without need for further explanation/evaluation. *Compare id. with Mitchell supra,* 771 F.3d at 784-85 and *Beavers, supra,* 601 Fed.Appx. at 822.

With these principles in mind, the Court turns first to Plaintiff's arguments relative to the Appeals Council's treatment of Dr. Timberlake's treatment records and medical source and CAP statements dated August 3, 2015, which, as aforesaid, was, as follows: "We also looked at records and a medical source statement from Perry Timberlake, M.D. dated August [3], 2015 (4 pages). The Administrative Law Judge decided your case through December 31, 2013, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits." (Tr. 2.) According to Plaintiff, these statements are inappropriate and do not

demonstrate that the ALJ adequately evaluated the new evidence, thereby requiring remand. (Doc. 18, at 8 (citing numerous cases, including *Flowers, supra*; *Jennings v. Colvin,* 2014 WL 1668487 (S.D. Ala. Apr. 28, 2014); *Hunter v. Colvin,* 2013 WL 1219746 (S.D. Ala. Mar. 25, 2013); and *Bowden v. Commissioner of Social Security,* 2012 WL 2179119 (M.D. Fla. Jun. 13, 2012)). This Court cannot agree with this initial argument by Plaintiff because, as alluded to earlier, Eleventh Circuit panel opinions subsequent to *Flowers* have called into question any remaining viability of *Flowers*, *compare Mitchell, supra,* 771 F.3d at 784-85 *with Beavers,* 601 Fed.Appx. at 822, and since the remaining cases relied upon by Plaintiff all contain language similar to *Flowers, compare id.* at 740 ("The Appeals Council stated that it had considered Flowers's reasons for her disagreement with the ALJ's decision and her additional evidence. The Appeals Council concluded 'that this information does not provide a basis for changing the Administrative Law Judge's decision.'") *with Jennings, supra,* at *5 ("[T]he Appeals Council merely provided the following perfunctory language: 'In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision.'"); *Hunter, supra,* at *4 ("'In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. . . . We found that this information does not provide a basis for changing the Administrative Law Judge's decision.'" (emphasis eliminated)); and *Bowden, supra,* at *1 ("The Appeals Council stated that it had considered the additional evidence submitted by Claimant, but it denied Claimant's request for review, stating that

it 'does not provide a basis for changing the [ALJ]'s decision.'"), this Court cannot agree with Bell that the language utilized by the Appeals Council was inappropriate and does not demonstrate that it adequately evaluated the new evidence, *see Beavers, supra*. This conclusion is confirmed by more recent cases in which district courts have given no indication that language all but identical to that utilized by the Appeals Council in this case amounts to perfunctory language that does not demonstrate adequate/meaningful evaluation of the new evidence. *Compare Putman v. Colvin,* 2016 WL 5253215, *10-11 (N.D. Ala. Sept. 22, 2016) (distinguishing *Flowers* and "automatic remand" in a case in which the Appeals Council, in addition to stating "'this information does not provide a basis for changing the [ALJ's] decision[,]'" also "went on to explain that the ALJ 'decided your case through March 31, 2013, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits.'") *with Matos v. Colvin,* 2015 WL 5474486, *5 (M.D. Fla. Sept. 17, 2015) ("The Appeals Council determined that the December 2012 opinion of Dr. Reeves did not provide a basis for changing the ALJ's decision because: 'The Administrative Law Judge decided your case through December 31, 2010, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits.' . . . Here, the opinion is dated almost two years after the date last insured and there is no indication from Dr. Reeves that the limitations he found in 2012 were present two years earlier. Indeed, there is a dearth of evidence prior to the expiration of Plaintiff's insured status that could support these limitations. The only

evidence Plaintiff cites is a November 29, 2010 x-ray which revealed *moderate* degenerative changes, soft tissue swelling and ossified bodies along the medial joint []. There is no finding of the 'significant subtalar joint arthrosis' presented two years later. The Appeals Council applied proper standards of law and its conclusion is supported by substantial evidence."); *see Hunter, supra,* at *4 ("Here, the Appeals Council could have meaningfully addressed the plaintiff's new evidence by, for example, specifically rejecting it because (in its view) the new evidence did not relate to the period at issue."). Implicit in *Putman* and *Matos* is the recognition that the Appeals Council's language, which is identical to the language used by the Appeals Council in this case (save for identification of the date last insured), is directed to materiality and/or chronological relevance and, therefore, is not an inadequate/perfunctory evaluation of the evidence requiring remand under *Flowers* and its progeny. *See Putman, supra,* at *10-11; *Matos, supra,* at *5.

That the foregoing language utilized by the Appeals Council is directed to the materiality and/or chronological relevance of the August 3, 2015 office record and assessments penned by Dr. Timberlake offers the perfect transition to address Plaintiff's penultimate argument that the Appeals Council erred in refusing to consider the opinion of Dr. Timberlake based solely on the date of the assessment form. (*See* Doc. 18, at 8-9 ("[T]his Court has determined that the date of the assessment is not the determining factor. 'The evidence presented here, a letter from plaintiff's treating physician along with a medical source statement and clinical assessment of pain completed by that physician . . . is dated November 8, 2011 . . . while the ALJ's decision here is dated September 22, 2011[.] That Dr. Davis's opinion is dated **more than one month after**

the ALJ's decision, however, does not shut out the possibility, particularly because of Dr. Davis's longstanding treating relationship with the plaintiff, that his opinion 'relate[s] to the period on or before the date of the ALJ's decision.' [quoting *Hunter, supra,* at *3.] Because of Dr. Timberlake's status as a long-time treating physician, his opinion could reasonably be material to the period of treatment before December 31, 2013.")). This Court simply cannot agree with Plaintiff that Dr. Timberlake's August 3, 2015 medical source statement and CAP could reasonably be material to the period before December 31, 2013, and this disagreement does not "stand" solely on the fact that Dr. Timberlake's opinion was given much more than one month after the ALJ's decision or the date last insured, the assessments being completed more than **nine months** after the ALJ's decision and **twenty months** after the date last insured.[10] Instead, the primary basis for this disagreement lies in the fact that Dr. Timberlake, as referenced by the Appeals Council, gave no indication that the limitations he found on August 3, 2015 were present some twenty months earlier (or even nine months earlier), and, indeed, he could have given no such indication inasmuch as a number of the diagnoses upon which his medical source statement (for instance) was based (*see* Tr. 10 (checking "yes" to the question "Are the limitations, to the degree checked above, normally expected from the type and severity of the diagnoses in this case?")) were not entered in Timberlake's records until August 3, 2015 (*see* Tr. 9 (entering in the record as diagnoses, on August 3, 2015, *inter alia,* carpal tunnel syndrome and intervertebral disc disorder with radiculopathy of lumbar region)); therefore, Dr. Timberlake's August 3,

---

[10]      To be sure, these facts, in the undersigned's opinion, establish the chronological irrelevance of Dr. Timberlake's August 3, 2015 evidence, as referenced in the decision of the Appeals Council (*see* Tr. 2).

2015 assessments are not material, as referenced by the Appeals Council (Tr. 2), because they do not create a reasonable possibility that they would change the administrative outcome.[11] *Compare Putman, supra,* at *12 ("[T]his report [from the Anniston Medical Clinic from May 13, 2014] originated not only after the ALJ hearing decision, but over a year after Plaintiff's date last insured. Given both that the ALJ already noted these impairments and the remoteness in time from Plaintiff's date last insured, this report does not create a reasonable possibility that it would change the administrative outcome and is thus immaterial.") *with Matos, supra,* at *5 ("Here, the opinion is dated almost two years after the date last insured and there is no indication from Dr. Reeves that the limitations he found in 2012 were present two years earlier. Indeed, there is a dearth of evidence prior to the expiration of Plaintiff's insured status that could support these limitations. The only evidence Plaintiff cites is a November 29, 2010 x-ray which revealed *moderate* degenerative changes, soft tissue swelling and ossified bodies along the medial joint []. There is no finding of the 'significant subtalar joint arthrosis' present two years later." (emphasis in original)).

Turning to the office notes generated between May 30, 2014 and June 1, 2015 by the Hale County Hospital Clinic—primarily Dr. Timberlake—the undersigned agrees

---

[11] There is simply no medical evidence in this record dated prior to December 31, 2013 which would support the severe limitations noted by Dr. Timberlake on August 3, 2015. (*See* Tr. 194 (November 9, 2012 physical examination by Dr. Robert Posey produced full range of motion of the back, with no tenderness to palpation and a negative straight leg raise, and a deformity to the right shoulder AC joint but with good range of motion); Tr. 217 (physical examination by Dr. Perry Timberlake on May 3, 2013, revealed a normal shoulder exam and that the right knee was slightly larger than the left but nontender); Tr. 245-46 (November 27, 2013 physical examination by Dr. Timberlake reflected a normal right shoulder, except for a hard nodule on the top of the shoulder, and a normal right knee)). Indeed, these mild and relatively innocuous physical findings, most of which were generated by Dr. Timberlake, while fully consistent with the physical residual functional capacity assessment of the ALJ (*see* Tr. 22), are not consistent with the severe limitations noted by Dr. Timberlake (*see* Tr. 10).

with the Defendant's implicit suggestion that Plaintiff's June 13, 2017 motion to correct the record (Doc. 33) should be denied because it was filed late (*see* Doc. 35, at 1-2), certainly well after Plaintiff's counsel was aware that these records were not part of the administrative record (*compare id. with, e.g.,* Doc. 18, at 7 (October 10, 2016 brief makes reference to the office records but the records are not attached to the brief)). Nevertheless, at the very least, the Court agrees with the Commissioner that the motion is properly denied as moot, with no requirement for remand, because Plaintiff's motion contains no showing that the treatment records from Hale County Hospital Clinic are material (*see generally* Doc. 35). In other words, the Plaintiff's motion contains no argument that these office records are "'relevant and probative so that there is a reasonable possibility that [they] would change the administrative result.'" *Ring, supra,* at *4, quoting *Hyde v. Bowen,* 823 F.2d 456, 459 (11th Cir. 1987).

The undersigned again makes clear that the only information that Plaintiff attached to his motion to correct record that are not already a part of the administrative record in this case are the office notes generated from four visits by Bell to the Hale County Hospital Clinic from May 30, 2014 through June 1, 2015, some eight pages in number (Doc. 33, Attached Medical Records, at 8-15), not the nine pages referenced in the Defendant's response (Doc. 35, at 2 & 4). The August 4, 2014 MRI of the right shoulder (Doc. 33, Attached Medical Records, at 16) is a part of the administrative transcript (Tr. 305) and was specifically reviewed by the ALJ in reaching his decision (Tr. 26 & 27); therefore, while that MRI report is of tangential importance with respect to some of the aforementioned office notes generated between May 30, 2014 and June 1, 2015, this Court obviously need not take up the materiality of the August 4, 2014 MRI

report. Turning to the treatment records, the undersigned initially notes that on May 30, 2014, Bell presented to Dr. Timberlake complaining of a knot in his chest and physical examination revealed a normal sternum (Doc. 33, Attached Medical Records, at 14); this examination note is obviously not material, Plaintiff having made no claim that he is entitled to benefits because of a knot in his chest (*see, e.g.,* Doc. 17, at ¶ 7 (identifying impairments as depressive disorder, degenerative changes in the knee, and shoulder tendinosis)). The remaining office notes (Doc. 33, Attached Medical Records,at 8-13) reflect the following: (1) on June 4, 2014, Bell presented to Dr. Timberlake with complaints of chronic pain in the right shoulder and right knee; physical examination revealed full range of motion and good strength in both shoulders, with Timberlake referencing a plan to obtain an MRI of the "KNEE AND SHOULDER THROUGH GS" (*id.* at 12-13); (2) on August 1, 2014, Bell presented to Dr. Timberlake for follow-up on joint pain and though the office note contains nothing indicating that Timberlake physically examined Plaintiff's shoulders or knees, it does contain another notation to send him to "GS FOR MRI OF RIGHT SHOULDER" (*id.* at 10); and (3) on June 1, 2015, Bell presented to Dr. Deborah Carlisle complaining of back pain, with examination of the back producing no C-spine, T-spine, or L-spine point tenderness and showing full range of motion of the L-spine, with positive heel toe ambulation (*id.* at 8-9). There is nothing about these absolutely negligible examination findings (*id.* at 8-13) that would change the administrative result, particularly when it is recognized that the ALJ specifically reviewed and considered in his administrative decision the knee and shoulder x-rays/imaging referenced in Dr. Timberlake's examination notes (*compare id. with* Tr. 26-27 & 301-08); indeed, as recognized in an earlier portion of this decision, the results of

the imaging of Plaintiff's knees and right shoulder support the ALJ's RFC assessment. Thus, these office notes are not material because there is not a reasonable possibility that the ALJ would have reached a different physical RFC assessment had he seen Bell's new evidence. *See Beavers, supra,* 601 Fed.Appx. at 823 ("The new evidence also is not 'material,' in that there is not a 'reasonable possibility' the ALJ would have made a 'marked' finding in one of the other five domains or made an 'extreme' finding in any of the six domains had he seen Worthy's new evidence."); *see also Mitchell, supra,* 771 F.3d at 785 (noting that new evidence did not undermine the substantial evidence supporting the ALJ's decision). Accordingly, the Court simply **MOOTS** Plaintiff's motion to correct the record (Doc. 33) because none of the relevant medical information attached to the motion is material and, therefore, no remand is warranted.

In light of the foregoing and because substantial evidence of record supports the Commissioner's determination that Bell can perform the physical and mental requirements of a range of light work as identified by the ALJ  and plaintiff makes no argument that this residual functional capacity would preclude his performance of the light jobs identified by the VE during the administrative hearing (*compare* Doc. 18 *with* Tr. 60-62), the Commissioner's fifth-step determination is due to be affirmed. *See, e.g., Owens v. Commissioner of Social Security,* 508 Fed.Appx. 881, 883 (11th Cir. Jan. 28, 2013) ("The final step asks whether there are significant numbers of jobs in the national economy that the claimant can perform, given h[er] RFC, age, education, and work experience. The Commissioner bears the burden at step five to show the existence of such jobs . . . [and one] avenue[] by which the ALJ may determine [that] a claimant has the ability to adjust to other work in the national economy . . . [is] by the use of a

VE[.]"(internal citations omitted)); *Land v. Commissioner of Social Security,* 494

Fed.Appx. 47, 50 (11th Cir. Oct. 26, 2012) ("At step five . . . 'the burden shifts to the

Commissioner to show the existence of other jobs in the national economy which, given

the claimant's impairments, the claimant can perform.' The ALJ may rely solely on the

testimony of a VE to meet this burden." (internal citations omitted)).

## CONCLUSION

It is **ORDERED** that the decision of the Commissioner of Social Security denying

Plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 30th day of June, 2017.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**